IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

EILEEN M. KELLY,               )
                               )
            Plaintiff,         )
                               )
     v.                        )    Case No.
                               )    05-5027-CV-SW-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,            )
                               )
            Defendant.         )

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Eileen Kelly seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Title
II of the Social Security Act ("the Act").  Plaintiff argues
that (1) the ALJ erred in failing to give controlling weight
to the opinion of plaintiff's treating physician, Jasbir
Dhawan, M.D., and (2) the ALJ arbitrarily determined
plaintiff's residual functional capacity.  I find that the
substantial evidence in the record as a whole supports the
ALJ's determination that plaintiff is not disabled.
Therefore, plaintiff's motion for summary judgment will be
denied and the decision of the Commissioner will be
affirmed.

## I.  BACKGROUND

On January 8, 2002, plaintiff applied for disability benefits alleging that she had been disabled since May 2, 2001.  Plaintiff's disability stems from congestive heart failure, hypothyroidism, and depression.  Plaintiff's application was denied on April 16, 2002.  On August 6, 2003, a hearing was held before an Administrative Law Judge.  On January 30, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On December 29, 2004, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is

2

supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

3

***III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS***

An individual claiming disability benefits has the
burden of proving she is unable to return to past relevant
work by reason of a medically-determinable physical or
mental impairment which has lasted or can be expected to
last for a continuous period of not less than twelve months.
42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that
she is unable to return to past relevant work because of the
disability, the burden of persuasion shifts to the
Commissioner to establish that there is some other type of
substantial gainful activity in the national economy that
the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853,
857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974
(W.D. Mo. 2000).

The Social Security Administration has promulgated
detailed regulations setting out a sequential evaluation
process to determine whether a claimant is disabled. These
regulations are codified at 20 C.F.R. §§ 404.1501, et seq.
The five-step sequential evaluation process used by the
Commissioner is outlined in 20 C.F.R. § 404.1520 and is
summarized as follows:

4

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

**IV.   THE RECORD**

The record consists of the testimony of plaintiff and vocational expert Lesa Keen, in addition to documentary evidence admitted at the hearing.

**A.   ADMINISTRATIVE REPORTS**

The record contains the following administrative reports:

5

**Earnings Record**

The record shows that plaintiff earned the following income from 1987 through 2003:

| Year | Earnings | Indexed Earnings |
|------|----------|------------------|
| 1987 | $    566.82 | $    937.29 |
| 1988 | 3,320.53 | 5,233.05 |
| 1989 | 5,124.67 | 7,768.72 |
| 1990 | 9,979.28 | 14,460.12 |
| 1991 | 12,097.97 | 16,900.33 |
| 1992 | 13,830.15 | 18,373.44 |
| 1993 | 9,933.23 | 13,083.83 |
| 1994 | 10,290.26 | 13,199.83 |
| 1995 | 14,903.91 | 18,381.20 |
| 1996 | 18,362.23 | 21,590.51 |
| 1997 | 17,488.19 | 19,429.09 |
| 1998 | 14,988.23 | 15,823.50 |
| 1999 | 21,130.10 | 21,130.10 |
| 2000 | 19,406.21 | 19,406.21 |
| 2001 | 5,416.79 | 5,416.79 |
| 2002 | 0.00 | 0.00 |
| 2003 | 0.00 | 0.00 |

(Tr. at 73-74).

**Disability Report - Field Office**

On January 8, 2002, plaintiff met face to face with Vickie DeArmond of Disability Determinations (Tr. at 81-84). Ms. DeArmond observed that plaintiff had no difficulty hearing, reading, breathing, understanding, coherency,

6

concentrating, talking, answering, sitting, standing,
seeing, using her hands, or writing (Tr. at 83).  She did,
however, appear to have difficulty walking (Tr. at 83).  Ms.
DeArmond wrote the following observations:  "Was driven by
mother to interview. . ..  Good grooming.  Very pale.  Drug
bottoms of feet against floor when walking as if no energy
to lift them.  Polite, pleasant.  Read own apps, seemed to
understand and have good memory." (Tr. at 83).

**B.    *SUMMARY OF MEDICAL RECORDS***

On June 9, 2000, plaintiff saw Nanjappa Chandramohan,
M.D., at the request of Dr. Brian Minton for consultation on
thyroid problems (Tr. at 153, 156-159).  Plaintiff weighed
187 pounds.  The records reflect that plaintiff had lost 30
pounds rapidly, she had not been eating much, she had a
rapid heart beat, and she complained of daytime drowsiness.
Plaintiff said she sleeps all the time, feels tired, and is
unable to do her routine occupation because of extreme
tiredness.  She was smoking a pack of cigarettes per day and
had for 15 years.  She was not interested in stopping
smoking, and she had no exercise routine.  Plaintiff
reported no psychological problems, no depression or
anxiety.  Her judgment, orientation, recent and remote
memory, and affect were all normal.  Deep tendon reflexes at

Case 3:05-cv-05027-REL   Document 14   Filed 06/08/06   Page 7 of 40

the knees and ankles were normal.  Vibration sense and
monofilament was normal in the feet.  There was no abnormal
movement of the extremities, no inflammation or tenderness
was present in the muscles.  Dr. Chandramohan diagnosed
Thyrotoxic Grave's disease with goiter, multinodular, and
ordered lab work, started plaintiff on Tapazole[1] 15 mg twice
a day and Decadron[2] 2 mg three times a day.  Plaintiff's
Inderal[3] was increased to 80 mg three days a day.  Plaintiff
was excused from work for two weeks while the Tapazole
"takes control of the hyperthyroidism."

On June 23, 2000, plaintiff saw Dr. Chandramohan (Tr.
at 152, 154).  Plaintiff weighed 188.5 pounds.  Her
nervousness and fatigue were somewhat better.  Plaintiff's
judgment, orientation, recent and remote memory were normal,
she had no depression, and her anxiety was better.  She had
no joint swelling, no inflammation, no tenderness, no
abnormal movements.  Dr. Chandramohan approved plaintiff's

---

[1]Prevents the thyroid from producing too much thyroid
hormone.

[2]Used to treat endocrine (hormonal) disorders when the
body does not produce enough of its own steroids.

[3]A beta blocker used to reduce hypertension (high blood
pressure), to treat angina (chest pain), to treat irregular
heartbeats, to treat migraines, to treat tremor, and to
reduce the risk of a recurrent heart attack.

Case 3:05-cv-05027-REL   Document 14   Filed 06/08/06   Page 8 of 40

return to work on July 3, 2000.

On July 13, 2000, plaintiff saw Dr. Chandramohan[4] (Tr. at 151, 155). She complained of being tired. Plaintiff weighed 193 pounds. "Went back to work Wednesday, was feeling well until she went to work and had episode of excessive sweating." Plaintiff's judgment, orientation, recent and remote memory, and affect were normal. She had no pain, no swelling, no inflammation, and no tenderness. Dr. Chandramohan ordered lab work and told plaintiff to come back in a week.

On July 20, 2000, plaintiff saw Dr. Chandramohan (Tr. at 147, 150). She was listed as a smoker, and she weighed 196 pounds. Plaintiff's judgment, orientation, recent and remote memory, and affect were normal. She had no depression, no pain, no swelling, no inflammation, no tenderness, no abnormal movements. Dr. Chandramohan wrote, "Plan on releasing her Wednesday to work. Clinically appears improved though patient still says she doesn't have enough energy even just staying home."

_____

[4]The records from Dr. Chandramohan include several pages which are dated and several pages which appear to be the second page of records which are not dated. I have attempted to piece the records together using information from tests ordered/reviewed and dosages of medication.

Case 3:05-cv-05027-REL   Document 14   Filed 06/08/06   Page 9 of 40

On July 25, 2000, plaintiff saw Dr. Chandramohan (Tr. at 148-149). Plaintiff was listed as a smoker, and she weighed 193.5 pounds. Plaintiff's judgment, orientation, recent and remote memory, and affect were normal, and she had no depression, pain, swelling, inflammation, tenderness, or abnormal movements. Dr. Chandramohan told plaintiff she needed to quit smoking. The records reflect that Dr. Chandramohan kept plaintiff "off duty until feel better Monday 7/31/00".

On October 9, 2000, plaintiff saw Dr. Chandramohan (Tr. at 145-146). Plaintiff weighed 227 pounds. The records reflect that plaintiff's chronic anxiety was resolved. Her judgment, orientation, recent and remote memory, and affect were normal. She had no depression, anxiety, inflammation, or tenderness. Dr. Chandramohan wrote, "Patient needs to decrease calories since she gained 34 pounds since ablater [the removal of her thyroid]."

On February 9, 2001, plaintiff saw Dr. Chandramohan (Tr. at 138-139). She complained of being tired. She had no chest pain, shortness of breath, numbness, tingling, headache, palpitations, or dizziness. Her weight was 214 pounds. Dr. Chandramohan observed no depression or anxiety.

10

The doctor increased plaintiff's Levoxyl[5] dosage from 75 mg to 125 mg and ordered repeat blood work.

On March 12, 2001, plaintiff was seen at St. John's Medical Center complaining of feeling tired at times and having decreased energy (Tr. at 222). Plaintiff's weight was 213 pounds.

On March 13, 2001, plaintiff was seen at St. John's Medical Center (Tr. at 221). She complained of being thoroughly exhausted, and she had a fever.

On March 23, 2001, plaintiff was seen at St. John's Medical Center (Tr. at 220). Her weight was 206 pounds. She reported she was sleeping 12 to 14 hours per day, but she did not think she was depressed. The doctor assessed "fatigue, denies depression". Plaintiff was scheduled to have a sleep study consult.

On March 30, 2001, plaintiff saw Dr. Chandramohan (Tr. at 137, 141). She had no new symptoms. Her weight was 206 pounds. Dr. Chandramohan wrote, "Need to see dietician and increase exercise and lose weight."

On April 5, 2001, plaintiff was seen at St. John's Medical Center complaining of hot flashes (Tr. at 218). She

---

[5]Levoxyl is a thyroid hormone important for normal energy and metabolism.

11

weighed 202 pounds.

On April 13, 2001, plaintiff was seen at St. John's Medical Center for a sleep study follow up (Tr. at 217). The records stated "await sleep study results".

On April 20, 2001, plaintiff had a sleep study done by Amy Meoli, M.D. (Tr. at 246). The results were "consistent with severe daytime sleepiness."

May 2, 2001, is plaintiff's alleged onset of disability.

On June 11, 2001, plaintiff saw Dr. Chandramohan (Tr. at 136, 140). She complained of feeling tired and weak. She had no chest pain, no shortness of breath, no numbness, no tingling, no headache, no palpitations, no dizziness. Her weight was 214 pounds.

On June 19, 2001, plaintiff had lab work done (Tr. at 132). Her SGPT[6] was high at 77 (normal is 9-52); her SGOT[7]

---

[6]Serum glutamic pyruvic transaminase, an enzyme that is normally present in liver and heart cells. SGPT is released into blood when the liver or heart are damaged. The blood SGPT levels are thus elevated with liver damage (for example, from viral hepatitis) or with an insult to the heart (for example, from a heart attack). Some medications can also raise SGPT levels. Also called alanine aminotransferase (ALT).

[7]Serum glutamic-oxaloacetic transaminase. An enzyme found in the liver, heart, and other tissues. A high level of SGOT released into the blood may be a sign of liver or

was high at 83 (normal is 14-36), her triglycerides[8] were high at 756 (normal is 35-135), her cholesterol was high at 455 (normal is 127-200), her VLDL[9] was high at 151.2 (normal is 2-29), her LDL was high at 256 (normal is less than 130), and her cholesterol/HDL ratio was high at 9.4 (normal is less than 4.4).

On June 29, 2001, plaintiff saw Dr. Chandramohan (Tr. at 127, 142). Her weight was 213 pounds. Dr. Chandramohan wrote, "Needs low carb diet, low saturated fat, low calorie diet, and increase exercise. . . . No alcohol."

On August 9, 2001, plaintiff had blood work done (Tr. at 126). Her triglycerides were high at 681 (normal is 35-135), her cholesterol was high at 239 (normal is 127-200),

_____

heart damage, cancer, or other diseases.

[8]Triglycerides are a type of fat made in the liver that circulate in the blood with other fats such as cholesterol. High triglyceride levels are a risk factor for some diseases, including heart disease.

[9]Lipoproteins are mixtures of fatty cholesterol and proteins in the blood that transport cholesterol, triglycerides, and other lipids to various tissues. There are three types: high density lipoprotein (HDL), low density lipoprotein (LDL), and very low density lipoprotein (VLDL). Very low density lipoprotein (VLDL) is composed mostly of cholesterol, with little protein. VLDL is often called "bad cholesterol" because it deposits cholesterol on the walls of arteries. Increased levels of VLDL are associated with atherosclerosis and coronary heart disease.

13

her HDL[10] cholesterol was low at 30.2 (normal is 35-86), her VLDL cholesterol was high at 136.2 (normal is 1-36), her cholesterol/HDL ratio was high at 9.9 (normal is less than 4.4), and her TSH[11] was high at 6.51 (normal is 0.32-5.0).

On August 9, 2001, plaintiff saw Bryan Minton, M.D., for a follow up (Tr. at 215). Plaintiff had received a sleep study by Dr. Meoli and Dr. Minton intended to go over the results. However, plaintiff had been in contact with Dr. Meoli and said her hypersomnolence[12] was "being taken care of." Dr. Minton stated he would be leaving the area and asked plaintiff to follow up with Dr. Godfrey.

On August 10, 2001, plaintiff saw Dr. Chandramohan (Tr. at 143-144). Plaintiff weighed 204 pounds. Dr. Chandramohan wrote, "encouraged to continue to lose weight and exercise."

---

[10]High-density lipoproteins (HDL) form a class of lipoproteins that carry cholesterol from the body's tissues to the liver. Because HDL can remove cholesterol from atheroma within arteries, and transport it back to the liver for excretion or re-utilization, they are seen as "good" lipoproteins. When measuring cholesterol, any contained in HDL particles serves as protection to the body's cardiovascular health.

[11]Thyroid stimulating hormone.

[12]Falling asleep in any social situation where it is inappropriate to fall asleep.

14

Plaintiff was at St. John's Regional Medical Center from November 6, 2001, until November 15, 2001 (Tr. at 161-212). Plaintiff had not been taking her thyroid medication regularly. She had progressive fatigue and somnolence [an inclination to sleep] over the last several months. The two months previous, she had developed a mumbling and slurred speech pattern and a stumbling and shuffling-type of gait. The morning of November 6, 2001, plaintiff did not go to work because she did not feel well. Later in the day, she called her mother and asked to go to the emergency room due to shortness of breath. Plaintiff's mother took her to the hospital, noting that plaintiff did not appear overly dyspneic [short of breath]. Upon checking into the emergency room, plaintiff became very short of breath, collapsed, and suffered cardiopulmonary arrest. Plaintiff was intubated and put on a ventilator, she was shocked multiple times, her heart restarted, and eventually a pulse returned. Plaintiff was admitted to the intensive care unit in critical condition.

Plaintiff reported that she stopped smoking about a year ago. At that time she was smoking a pack and a half per day. She recently began smoking again, smoking about five cigarettes per week.

15

An echocardiogram was performed, demonstrating severe dilated cardiomyopathy with a left ventricular ejection fraction[13] of 15% to 20%. Her lab tests showed very abnormal thyroid function. Plaintiff had been prescribed thyroid replacement medication, but said she only takes four out of seven doses per week on average. She was on Ritalin for possible sleep apnea. Plaintiff had been trained to follow a diet but "was not doing a good job." The records include the following: "Patient had done a similar problem before with the discontinuation of her medications and ending up in severe hypothyroidism. At that time we confronted her and told her that she should not stop her medications because this might cause problems. In spite of exam patient quit taking her medications again. Exact reason why she does not take the medications is not apparent. Mother says she does not appear to be depressed and does not have any specific reason for her depression that we are aware of." (Tr. at 188). Plaintiff denied any anxiety or depression (Tr. at 193). Plaintiff's muscle strength and tone were normal.

_____

[13]The fraction of blood pumped out of a ventricle with each heart beat. Healthy individuals typically have ejection fractions of greater than 55%.

16

Plaintiff had a dual chamber defibrillator implanted.

On January 16, 2002, plaintiff was seen by William Craig, M.D., for a follow up after her hospitalization for cardiac arrest (Tr. at 224-225). "[S]he was found to have profound hypothyroidism at that time and a dilated cardiomyopathy. Prior to discharge, she did have a cardiac catheterization that showed normal coronary arteries and significant improvement in LV [left ventricle] function with an estimated ejection fraction in the range of 50%. An ICD[14] was implanted to protect her from any further arrhythmias. Thankfully, since discharge, she has had no ICD discharges. She also has had no signs or symptoms of congestive heart failure. Her main complaint is severe fatigue and lethargy." Dr. Craig discontinued plaintiff's Pacerone[15] and reduced her Zestril[16] to 5 mg a day and her Digitek[17] to 1.25 mg a day. He ordered lab work and directed her to return in three months.

----

[14]Implantable cardioverter defibrillator.

[15]Used to treat irregular heartbeats.

[16]Used to lower blood pressure, to treat congestive heart failure, and to improve the survival rate after a heart attack.

[17]Helps the heart beat more strongly and regularly.

17

On March 8, 2002, plaintiff had a psychological
evaluation by Jan Snider Kent, Ph.D., after having applied
for Social Security benefits (Tr. at 226-229). The report
reads in part as follows:

Education History:
Ms. Kelly attended school through the 12th grade. Ms.
Kelly attended community college for two and a half
semesters almost obtaining a degree in factory
supervision. . . .

Employment History:
Ms. Kelly worked at Little Caesar's Pizza as a pizza
maker from 1987 to 1988. She worked at Western Sizzlin
as a cook from 1988 to 1993. She worked at Olive
Garden as a cook from 1993 to 1994. She worked at
Ozark Salad as a factory prep from 1995 to 2001. She
reports no difficulties whatsoever with these jobs
until she started having thyroid problems at Ozark
Salad. . . .

Medical History:
Ms. Kelly reports that she developed hypothyroidism in
March of 2000. She lost 40 pounds, began having
sweats, and was not eating or sleeping. She did not
take medication regularly and this led to congestive
heart failure in November, 2001. . . .

Daily Activities and Social Functioning:
Ms. Kelly gets up around 10:00 in the morning. She
eats breakfast and watches television with her
grandmother. She states she cannot stand long enough
to cook because of little energy. She states that
climbing stairs wears her out. She reports that she
cannot clean house due to her medical problems. She
states that if she goes to Wal-Mart she rides in a
cart. . . . She reports that she does not want to
drive because she is worried that if her defibrillator
goes off it will shock her and cause her to wreck. She
reports virtually no social activities outside of her
town because she is afraid to get outside of Joplin.
She is afraid she will not be close enough for medical

18

help.  She is afraid to go out with friends because she
is afraid that they will not be able to handle the
situation if she should develop heart problems.  She
states that she only really feels safe leaving home
with her mother because of this. . . .

Behavioral and Symptom Presentation:
. . . Ms. Kelly reports having trouble with depression
and anxiety since her congestive heart failure in 2001.
. . .  She reports that she is always anxious that her
defibrillator will go off.  She states that she often
worries about having to replace the batteries, but this
will not have to happen for another ten years.  She
denied any other significant symptoms of anxiety
disorders including PTSD [post traumatic stress
disorder], Obsessive-Compulsive Disorder, or Panic
Attacks.  She denied any psychotic symptoms and does
not appear delusional.

Cognitive Assessment:
On the Mini-Mental Status Evaluation . . . Ms. Kelly
obtained a score of 29 indicating no evidence of
impairment by delirium or dementia. . . .  On the Six
Item Cognitive Impairment Test . . . [her score
indicated] no evidence of dementia. . . .  Ms. Kelly's
vocabulary skills appeared to be in the Average range.
. . .  [I]mmediate memory skills [were] in the
Borderline range. . . .  [The tests showed a]
possibility of concentration difficulties.  Ms. Kelly's
intellectual functioning appears to be in the Average
range.  Working memory skills . . . [are in the]
Average range. . . .

SUMMARY:
Ms. Kelly presented as a thirty year old Caucasian
female whose intellectual functioning appears to be in
the Average range.  She appears to have had an
unimpaired work history until the development of
medical problems.  She is giving medical problems as
the sole reason for her inability to work.  She does
appear to be having some adjustment problems to her
medical difficulties, but this would not appear to
affect her job functioning.

19

CAPABILITIES:

1.   At the maximum, Ms. Kelly appears to be able to
     understand and remember complex instructions
     during a normal workday.

2.   At the maximum, Ms. Kelly can concentrate and
     persist on complex tasks during a normal workday.

3.   Ms. Kelly demonstrates the capacity, at the
     maximum, to interact in a moderate contact
     situation during a normal workday.

4.   Ms. Kelly demonstrates the capacity to interact in
     a moderate contact situation involving work
     supervisors and/or co-workers.

5.   Ms. Kelly, at the maximum, has the ability to
     adapt to a complex work environment.

6.   Ms. Kelly appears capable of managing her funds
     independently.

7.   It is reasonable to expect minimal improvement in
     Ms. Kelly's foreseeable future if treatment
     recommendations are followed.

8.   Ms. Kelly appears to be a fully reliable
     informant.

DIAGNOSIS:
Axis I:   Adjustment Disorder with Mixed Emotional
          Features . . . .

Axis V:   Global Assessment of Functioning:  65 [some
          mild symptoms]

(Tr. at 226-229).

On March 19, 2002, plaintiff was seen at St. John's

Regional Medical Center complaining of hot flashes and being

tired (Tr. at 233).  Her sleep was OK.

20

On March 19, 2002, Lester O. Bland, Psy.D., completed a Psychiatric Review Technique (Tr. at 251-265). Dr. Bland found that plaintiff's mental impairment was not severe. She suffered only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. She had no repeated episodes of decompensation.

On June 29, 2002, plaintiff saw Jasbir Dhawan, M.D. (Tr. at 303). Plaintiff weighed 174 pounds. She complained of being weak, could not walk any distance, was sleeping 14 to 16 hours per day. Dr. Dhawan started plaintiff on BuSpar for anxiety.

On September 26, 2002, plaintiff saw Dr. Dhawan (Tr. at 300). Plaintiff's weight was 169 pounds. Her energy level was OK. Dr. Dhawan continued her on Paxil for anxiety and depression.

On October 3, 2002, plaintiff saw Rick Scacewater, M.D., for shortness of breath (Tr. at 320). He diagnosed moderate obstructive lung disease with a significant response to bronchodilators.

On January 22, 2003, plaintiff saw Jack Rhoads, M.D., from Dr. Dhawan's office, for a follow up (Tr. at 296). She

21

had been on Paxil, but it was not helping.  Dr. Rhoads
switched her to Sarafem and continue all other medications
the same.

On January 23, 2003, plaintiff was seen by Susan
Pintado, M.D., at St. John's Regional Medical Center for lab
work (Tr. at 319).  Her triglycerides were high at 402
(normal is 35-135).  Dr. Pintado recommended diet and
exercise.

On February 19, 2003, plaintiff saw Jack Rhoades, M.D.,
from Dr. Dhawan's office, for a follow up (Tr. at 294).
Plaintiff had started on Sarafem [treats depression] on the
last visit.  "She is feeling better and sleeping a little
better, less depressed and less anxious."  Plaintiff's
weight was 210 pounds.  Dr. Rhoades recommended she
progressively increase the Sarafem to 40 mg a day and follow
up in two to three months.

On March 26, 2003, plaintiff saw Jack Rhoades, M.D.,
from Dr. Dhawan's office, for a follow up (Tr. at 292).
"She is doing fairly well. . . .  Her anxiety is pretty well
controlled.  She is switching now from Dexamethasone onto
Prednisone for her adrenal insufficiency.  She otherwise is
feeling fairly well."  Dr. Rhoades continued plaintiff on
the same medical management plan and directed her to return

22

to see Dr. Dhawan in two to three months.

On March 27, 2003, plaintiff saw Mark Moore, D.O., for a CT of her sinuses (Tr. at 213). His impression was probable partially empty sella[18] with no evidence of discrete pituitary mass.

On April 24, 2003, plaintiff was seen by Dr. Dhawan complaining of proptosis of her right eye [bulging eye]. Plaintiff said her fatigue was better. She had no weight loss or weight gain. Her weight was 230 pounds. Dr. Dhawan increased plaintiff's Levoxyl [thyroid hormone] and ordered a CAT scan.

On April 29, 2003, plaintiff saw Tom Ward, radiologist, for her bulging eye (Tr. at 311). He diagnosed asymmetrical thyroid ophthalmopathy.

On May 22, 2003, plaintiff saw Dr. Dhawan complaining of proptosis of her right eye [bulging eye] (Tr. at 285-286). Plaintiff's weight was 238 pounds and she reported doing no exercise. Dr. Dhawan diagnosed Graves' orbitopathy, right eye.

_____

[18]The pituitary gland is partially surrounded by a bony structure called the sella turcica. Normally, it is visible during a CT scan or MRI. In empty sella syndrome, the pituitary gland is not visible -- either because it has become flattened or has shrunk.

23

On July 15, 2003, Dr. Jasbir Dhawan completed a Medical Source Statement - Physical (Tr. at 282-283). Dr. Dhawan found that plaintiff could lift and carry five pounds frequently and occasionally, she could stand or walk for 30 minutes at a time and for three hours per day, and could sit for two hours at a time and for four hours per day. Dr. Dhawan found that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. She could frequently reach, handle, feel, speak, and hear. She should avoid moderate exposure to extreme cold, extreme heat, weather, wetness, humidity, dust, fumes, vibration, hazards, or heights. The form asks, "If patient suffers pain, is there need to lie down or recline to alleviate symptoms during an 8 hour work day?" Dr. Dhawan checked, "No." Dr. Dhawan also checked "No" indicating plaintiff's pain, use of medication, or side effects of medication do not cause a decrease in concentration, persistence, pace, or any other limitations.

## C.   *SUMMARY OF TESTIMONY*

During the August 6, 2003, hearing, plaintiff testified; and Lesa Keen, a vocational expert, testified at the request of the ALJ.

24

1.  **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 32 years of age, and is currently 34 (Tr. at 30). Plaintiff has a high school education (Tr. at 30).

Plaintiff previously worked in salad production from 1994 until 2001 (Tr. at 30). Plaintiff stood a lot on that job, opening cases of cans, making salad, packing it and shipping it (Tr. at 30). Plaintiff lifted 36 pounds -- the boxes she lifted held six six-pound cans (Tr. at 31). She worked on a conveyor belt, opening cans of things such as black olives or tomatoes (Tr. at 31). She put them in a mixer, then dumped it into a bucket that was lifted into the air into a machine which would fill up cartons (Tr. at 31). She then packed it into boxes and sent it down the line (Tr. at 31).

Plaintiff worked as a cook from November 1993 to November 1994 frying bacon and eggs, making bread, washing dishes, and mopping the floor (Tr. at 32). Plaintiff lifted up to 40 pounds on that job (Tr. at 32). Plaintiff worked at a restaurant called Western Sizzlin' from August 1988 through September 1993 doing similar work (Tr. at 33).

Plaintiff stopped working on May 2, 2001, her alleged onset date (Tr. at 33). Plaintiff was always tired, slept a

25

lot, had low energy (Tr. at 34). Toward the end of her
employment, she was missing three to four days of work per
month because of fatigue (Tr. at 34). Now standing to cook
dinner wears plaintiff out and she needs to sit down and
rest while cooking (Tr. at 35). Plaintiff can maintain an
activity for only ten minutes at a time before needing to
take a break (Tr. at 35).

Plaintiff falls asleep for about two hours each
afternoon (Tr. at 36). The more physical things she does,
the more tired she gets (Tr. at 36). Carrying in groceries
wears plaintiff out (Tr. at 37). Being under stressful
situations does not aggravate her symptoms (Tr. at 37).
When plaintiff climbs the stairs to go up to her bedroom,
she becomes short of breath and has to stop and rest halfway
there (Tr. at 38).

At the time of the hearing, plaintiff was five feet six
inches tall and weighed 188 pounds (Tr. at 35). She
testified that she had gained about 30 pounds during the
previous year because of her medications (Tr. at 35). That
weight gain has not aggravated her symptoms, however (Tr. at
35). Plaintiff considers her normal weight to be 160 to 165
pounds (Tr. at 42).

Case 3:05-cv-05027-REL   Document 14   Filed 06/08/06   Page 26 of 40

Plaintiff gets depressed because she cannot do anything (Tr. at 38). She becomes irritable, has a short temper, and gets upset (Tr. at 38). She has problems remembering things ten minutes later (Tr. at 38). Plaintiff is not being treated for depression or anxiety because Medicaid would not pay for it and she is unable to pay for it herself (Tr. at 41). She takes Prozac and Zyprexa for depression and anxiety (Tr. at 41).

Plaintiff feels a heaviness in her chest two to three times per week (Tr. at 40). It lasts a few minutes (Tr. at 40). She sits down, breathes deeply, and waits for it to go away (Tr. at 40).

Plaintiff's medications cause her right eye to protrude and cause her to gain weight (Tr. at 39). She also gets drowsy (Tr. at 39).

On a typical day, plaintiff will get up around 8:30 or 9:00 a.m. and have breakfast; take a shower; then have lunch; then she takes a mid-afternoon nap for about two hours; gets up and starts dinner, resting while cooking; has dinner; watches television; then goes to bed (Tr. at 43). Plaintiff lives in a house with her mother and grandmother (Tr. at 44). Plaintiff's mother does the household chores, most of the cooking, the cleaning, the laundry, the

27

shopping, and the yard work (Tr. at 44). Plaintiff does
some cooking and takes the trash out (Tr. at 44). Plaintiff
has a driver's license and she drives (Tr. at 45). She goes
over to her girl friends' houses to visit (Tr. at 45).

**2. Vocational expert testimony.**

Vocational expert Lesa Keen testified at the request of
the Administrative Law Judge. The vocational expert
testified that plaintiff's past relevant work consists of
production line worker, an unskilled position performed at a
medium exertional level; and a cook, which is a semi-skilled
position performed at the medium exertional level (Tr. at
47).

The first hypothetical involved an individual who could
carry up to five pounds; stand and walk for 30 minutes at a
time and for three hours total; sit for two hours at a time
and for four hours total; occasionally climb, balance,
stoop, kneel, crouch, or crawl; and may only have minimal
exposure to cold, heat, weather, humidity, dust, fumes,
vibration, hazards, and heights (Tr. at 47-48). The
vocational expert testified that such a person could not
perform any of plaintiff's past relevant work (Tr. at 48).
Because of the total of only seven hours for sitting,
standing, and walking, the hypothetical person could not

Case 3:05-cv-05027-REL   Document 14   Filed 06/08/06   Page 28 of 40

perform any full-time work (Tr. at 48).

If a person needed to lie down for two hours each afternoon, the person would be precluded from any full-time work (Tr. at 48).

## V. FINDINGS OF THE ALJ

On January 30, 2004, Administrative Law Judge John Flanagan entered his opinion finding plaintiff not disabled (Tr. at 15-21).

At step one of the sequential analysis, the ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 16).

At step two, the ALJ found that plaintiff suffers from the severe impairments of obesity, hypothyroidism, diabetes mellitus, and moderate air flow obstruction (Tr. at 16). He found that plaintiff has no severe mental impairment (Tr. at 16).

At step three, the ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 17).

The ALJ discredited the medical source statement of Dr. Dhawan as unsupported by the record, including his own treatment records (Tr. at 18-19). The ALJ also found plaintiff not credible (Tr. at 19-20). He then found that

29

plaintiff retains the residual functional capacity to perform a full range of sedentary work, with no non-exertional impairments and no mental limitations (Tr. at 17).

At step four of the sequential analysis, the ALJ found that plaintiff cannot return to any of her past relevant work (Tr. at 21).

At step five, the ALJ found that, taking into consideration plaintiff's age, education, employment experience, and residual functional capacity, the Medical-Vocational Guidelines direct a finding of not disabled (Tr. at 21).

Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI.  OPINION OF DR. DHAWAN

Plaintiff argues that the ALJ erred in failing to give controlling weight, or any weight, to the Medical Source Statement - Physical completed by Dr. Dhawan, plaintiff's treating physician.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory

30

diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician:  (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor.  20 C.F.R. § 404.1527(d)(2) - (5).

The opinion at issue is Dr. Dhawan's opinion in the Medical Source Statement completed on July 15, 2003.  Dr. Dhawan found that plaintiff could lift and carry five pounds frequently and occasionally, she could stand or walk for 30 minutes at a time and for three hours per day, and could sit for two hours at a time and for four hours per day.  Dr. Dhawan found that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl.  She could frequently reach, handle, feel, speak, and hear.  She should avoid moderate exposure to extreme cold, extreme heat, weather, wetness, humidity, dust, fumes, vibration, hazards,

31

or heights.  The form asks, "If patient suffers pain, is there need to lie down or recline to alleviate symptoms during an 8 hour work day?"  Dr. Dhawan checked, "No."  Dr. Dhawan also checked "No" indicating plaintiff's pain, use of medication, or side effects of medication do not cause a decrease in concentration, persistence, pace, or any other limitations.

The ALJ found that plaintiff has the residual functional capacity to perform the full range of sedentary work.  The ability to perform the full range of sedentary work requires the ability to lift no more than ten pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday. Sitting would generally total about six hours of an eight-hour workday. Unskilled sedentary work also involves other activities, classified as "nonexertional," such as

32

capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.[19]

Therefore, the relevant differences between the ALJ's findings and Dr. Dhawan's findings are (1) plaintiff's ability to lift occasionally, and (2) plaintiff's ability to sit.

In discrediting the Medical Source Statement of Dr. Dhawan, the ALJ stated as follows:

> On July 15, 2003, the claimant's treating physician, Dr. Dhawan, completed a "Medical Source Statement", apparently at the request of the claimant's attorney, in which he indicated that the claimant as capable of less than sedentary work. Specifically, he indicated that the claimant could lift/carry 5 lbs frequently as well as occasionally, could stand/walk continuously for 30 minutes, for a total of 3 hours in a work day, and could sit for 2 hours at one time, for a total of 4 hours in a work day. Finally, Dr. Dhawan indicated that the claimant could reach/handle/feel/speak/hear frequently, climb/balance/stoop/kneel/crouch/crawl occasionally, and had no need to lie down or recline if in pain, and he noted that the claimant's pain, use of medication, or side effects of medication did not cause a decrease in concentration, persistence or pace or any other limitations.

> While I normally afford a treating physician's opinion great weight, I find that the medical source statement prepared by Dr. Dhawan is not well supported by objective clinical findings but appears to have been written solely because the claimant's attorney requested that it be written. It is not supported by medically acceptable clinical and laboratory diagnostic

---

[19]Social Security Administration Policy Site: POMS Section DI 25015.020.

Case 3:05-cv-05027-REL   Document 14   Filed 06/08/06   Page 33 of 40

techniques or by Dr. Dhawan's own treatment notes.  I thus find it to be largely unpersuasive.

Following the hearing, I left the record open so that the claimant could update the reports from her treating sources.  However, this evidence consisted primarily of routine outpatient care and check-ups.  Substantively, the new evidence does not add any material evidence to the record.  Rather, it confirms that the medical source statement provided by Dr. Dhawan is not well supported by his own treatment records and is largely unsupported.  As such, I am not giving substantial weight to Dr. Dhawan's medical source statement.

(Tr. at 18-19).

**Length of the Treatment Relationship**

Plaintiff first saw Dr. Dhawan on June 29, 2002, and last saw Dr. Dhawan on May 22, 2003.  The Medical Source Statement was completed on July 15, 2003.

**Frequency of Examinations**

During the approximately one year that plaintiff was treated by Dr. Dhawan, she saw him four times.  Plaintiff also saw Dr. Rhoads from Dr. Dhawan's office on three occasions during that time.

**Nature and Extent of the Treatment Relationship**

Plaintiff first saw Dr. Dhawan for weakness, inability to walk any distance, and sleeping 14 to 16 hours per day. Dr. Dhawan prescribed BuSpar for anxiety.

Three months later, plaintiff reported that her energy level was OK.  Dr. Dhawan continued plaintiff on Paxil for

34

anxiety and depression.

Seven months later, plaintiff saw Dr. Dhawan for her bulging eye, and she said her fatigue was better.

One month later, plaintiff saw Dr. Dhawan again for her bulging eye.

None of this treatment has anything to do with plaintiff's ability or inability to lift or sit. Only on the first visit, which was slightly more than a year before the Medical Source Statement was completed, did plaintiff complain of decreased energy. Since then, plaintiff consistently reported to Dr. Dhawan that her energy level was OK and her fatigue was better. Plaintiff never complained to Dr. Dhawan of an inability to lift or of any problems with sitting.

Even considering the records of Dr. Rhoads, who apparently works with Dr. Dhawan, three more visits are involved. The first of those, on January 22, 2003, Dr. Rhoades switched plaintiff's Paxil to Sarafem. On February 19, 2003, plaintiff reported she was feeling better and sleeping better. On March 26, 2003, plaintiff told Dr. Rhoads she was doing well, her anxiety was controlled, and overall she was feeling fairly well. Dr. Rhoads' records to

Case 3:05-cv-05027-REL   Document 14   Filed 06/08/06   Page 35 of 40

not add any additional support to Dr. Dhawan's Medical
Source Statement opinion.

**Consistency of the Opinion with the Record as a Whole**

Dr. Dhawan's opinion that plaintiff can occasionally
lift only five pounds and sit for a total of only four hours
per day is not consistent with the record as a whole.
Plaintiff's alleged onset of disability was May 2, 2001.
After that time, plaintiff was encouraged to exercise by Dr.
Chandramohan on June 29, 2001, and again on August 10, 2001.
Dr. Pintado recommended on January 23, 2003, that plaintiff
exercise. On May 22, 2003, despite having been told for
months to exercise, plaintiff told Dr. Dhawan that she was
doing no exercise.

On August 9, 2001, plaintiff told Dr. Minton that her
hypersomnolence (falling asleep during the day) was "being
taken care of." On September 26, 2002, plaintiff told Dr.
Dhawan that her energy level was OK. On April 24, 2003,
plaintiff told Dr. Dhawan that her fatigue was better.

Two months after being released from the hospital,
plaintiff's left ventricle function was nearly normal with
an ejection fraction of 50%. There is no evidence that her
implanted defibrillator has ever had to discharge, meaning
plaintiff's heart has worked normally on its own. Plaintiff

36

was diagnosed in October 2002 with moderate obstructive lung disease, but plaintiff had a "significant response to bronchodilators."

There are no other health problems in the record. There is nothing in the record suggesting that plaintiff has any difficulty lifting ten pounds, and in fact plaintiff testified that she takes the trash out. There is nothing in the record suggesting that plaintiff has any difficulty sitting for more than four hours per day.

In addition to Dr. Dhawan's opinion in the Medical Source Statement being inconsistent with all of the other evidence in the record, I find that his opinion is inconsistent with plaintiff's complaints and is unreliable per se. Plaintiff told Dr. Dhawan on June 29, 2002, that she was weak and could not walk any distance. However, Dr. Dhawan found that plaintiff could walk for 30 minutes at a time and for three out of eight hours per day. If he were inclined to place a drastic restriction on plaintiff, his records would support no restriction other than walking. Furthermore, Dr. Dhawan's findings that plaintiff can sit for a total of four hours per day, stand or walk for a total for three hours per day, but does not need to lie down or recline during the day, makes no sense. I cannot imagine

37

what Dr. Dhawan believes plaintiff needs to do for the remainder of the day if she is not sitting, standing, walking, reclining, or lying down.

**Specialization of the Doctor**

It appears from the records that Dr. Dhawan is a general practitioner.

**Conclusion**

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's decision to discredit the opinion of Dr. Dhawan in the Medical Source Statement. The opinion is not supported by any tests or findings, it is inconsistent with Dr. Dhawan's own medical records, it is inconsistent with the other medical records, and it makes no sense because it accounts for only seven hours per workday with no options left for plaintiff's activities during the remaining hour.

Plaintiff's motion for summary judgment on this basis will be denied.

*VII. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY*

Plaintiff argues that the ALJ erred in finding that although plaintiff suffers from the severe impairments of obesity, hypothyroidism, diabetes mellitus, and moderate air

38

flow obstruction, she suffers from no non exertional limitations.

Plaintiff testified at the hearing that her weight gain did not aggravate any of her symptoms.  The ALJ discussed the medical evidence and concluded that plaintiff's noncompliance in taking her thyroid medication caused her cardiac arrest, that she has functioned quite well following her discharge with no signs or symptoms of congestive heart failure, her medical evidence since discharge consists of routine outpatient care monitoring her hypothyroidism, her sleep study was essentially normal, and she had a significant response to bronchodilators.  There simply is nothing in the record which is inconsistent with the ALJ's finding that plaintiff retains the residual functional capacity to perform the full range of sedentary work.

Plaintiff's motion for summary judgment on this basis will be denied.

### VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

39

ORDERED that the decision of the Commissioner is
affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 8, 2006

Case 3:05-cv-05027-REL   Document 14   Filed 06/08/06   Page 40 of 40